Charles E. TAMMINEN, Appellant,

v.

STATE of Texas, Appellee.

No. 04–81–00439–CR.

Court of Appeals of Texas,
San Antonio.

Dec. 22, 1982.

Discretionary Review Granted
March 16, 1983.

Charles Campion, San Antonio, for appellant.

Bill White, Dist. Atty., Alan E. Battaglia, Asst. Dist. Atty., San Antonio, for appellee.

Before CLARK, CANTU and BASKIN, JJ.

## OPINION

BASKIN, Justice.

This is an appeal from a conviction for aggravated rape, enhanced by proof of final judgment of conviction of another felony. Trial of the guilt/innocence phase was to a jury, and appellant was sentenced by the trial court to ninety-nine years' confinement.

Appellant raises eight grounds of error: two grounds claim error for admission of alleged hearsay evidence, and the third ground of error is directed to discussion by the prosecutor of the same alleged hearsay evidence; three grounds allege error in admission of testimony concerning an extraneous offense; the seventh ground involves admission of rebuttal evidence of injuries and medical problems of a person not the complainant; and the final ground complains of receipt, prior to sentencing, of evidence presented to the court by the prosecutor out of the presence of appellant and his counsel and to which they were denied access. Sufficiency of evidence to support the conviction is not challenged.

The voluminous record depicts a night of terror, brutality, and sexual abuse. The evidence spins a web of facts and circumstances from which the jury was justified and virtually compelled to convict appellant of aggravated rape. Although appellant testified that he neither forced anyone to go to a motel with him nor was in the room when two young women, one of whom was the complainant, were raped, he does not here challenge the sufficiency of the evidence to support his conviction for aggravated rape.

On or about December 8, 1976, at about 11:00 or 11:30 p.m., the complainant, P_____ A_____ C_____, (hereafter P_____), age seventeen, and another young woman, C_____ C_____, (hereafter C_____), also age seventeen, went to the Lamp Post Inn on the Austin Highway in San Antonio. The Lamp Post was variously described in the testimony as a stag disco-type lounge with topless dancers and a bar with go-go dancers.

After shooting a game of pool with C_____, P_____ went to watch the topless dancers. About a half hour later, C_____ came up to P_____, appearing to be very frightened. C_____ directed P_____'s attention to a table at which appellant and someone else were sitting. Appellant had earlier accused C_____ of being a police officer or "narc" who had caused him to be "busted" several years

earlier. He had threatened her with a gun and said he was going to blow her brains out. C_____ went to the ladies' room to escape but realized there was no window through which she could climb.

Appellant walked over to P_____ and yanked her out of her chair. He sent her to try to get some drugs. She called a friend on the telephone and asked him to bring some THC. The manager of the club heard part of the conversation and called the police.

When the police arrived in the parking lot, a friend warned appellant, and he pulled P_____ onto his lap. He displayed his gun to her and told her to act friendly. When the police came to appellant's table, complainant was sitting in his lap with her arm around his neck. A police witness described them as hugging and kissing. After checking appellant's identification, the police suggested that appellant and his friends leave the club.

Still fearful of appellant and his friends, P_____ and C_____ went into the parking lot with the men. About that time the friend whom P_____ had called arrived and gave her three or four baggies of marihuana. Then appellant and two other men, all members of the Bandido Motorcycle Club, and the two girls, along with a dog, got into appellant's pick-up truck. They went to the San Antonio Inn on I–H 35 where appellant already had a room.

As soon as they entered the room, the girls were told to take off their clothes, and they did so at gunpoint. Appellant forced one of the men to leave, taking the dog with him. Appellant and the other man whom complainant called "Shooter," forced both of the girls to perform oral sex with them, and they each had sexual intercourse with both of the girls. The men beat and pistol-whipped both of the girls. They warned the girls that they would kill them if they screamed, and turned up the volume of the television set to drown out the noise in the room.

At one point, the girls were bleeding so badly that appellant put them in the bathtub to try to clean them up. The bleeding continued, however, and the girls were taken back to the bedroom. Appellant suggested that they "waste" them, but Shooter said they should take them somewhere else.

In the meantime, the police had been called because of the noise in the room. When two officers arrived, they were accompanied to the room by a security officer of the San Antonio Inn. When they knocked on the door and called out "Security Officers," one of the men opened the door with the chain latch on and said, "Oh, just a minute. Let the girls get their clothes on." The officers waited and then knocked again but got no response. Then the door opened. C_____ came out, still naked and with blood on her face, and fell down in the hall.

When the officers entered the room, they found P_____ on one of the beds, unable to get up, but the men were gone, apparently through an open window. The officers ran back down the hall and out into the parking lot. Appellant, who was in the parking lot, saw them and ran to the back fence of the parking lot. He tried to jump the fence but did not succeed. He fumbled at his beltline and upon his second try, he jumped the fence. The officers gave chase, and one of them went through the fence after loosening a board, and apprehended appellant. The officers found a .45 caliber automatic pistol in the grass where appellant had attempted to jump the fence the first time.

The State introduced a great deal of evidence relating to the bloody condition of the motel room, the typing of the blood samples taken from the room and matching blood types with samples subsequently taken from appellant and from each of the girls. Many photographs were taken of the room and its contents, of the appellant, and of the swollen and bandaged faces of the girls. A further detailing of the evidence would serve no useful purpose.

■ By his first and second grounds of error, appellant claims that the trial court erred in denying his motions for mistrial based upon hearsay when the then manager

of the Lamp Post Inn testified, "One of the girls that came in the club fairly frequently came up to me and told me that the man over there had a gun," and, "Well, when the girl had pointed—told me about this gun, I looked back."

In each instance, appellant's objection was sustained. In addition, in each instance appellant requested that the jury be instructed to disregard the testimony, and the trial court so instructed the jury.

The only case cited by appellant for reversal is this court's opinion in *Quilice v. State*, 624 S.W.2d 940 (Tex.App.—San Antonio 1981), in which Justice Butts wrote:

This court will not reverse a conviction solely because an improper question was propounded. To cause reversal the question must be obviously harmful. *Walker v. State*, 513 S.W.2d 39, 42 (Tex.Cr.App. 1974); *Hartman v. State*, 507 S.W.2d 553 (Tex.Cr.App.1974).

We find that the testimony, if it was hearsay, was not "obviously harmful," as the trial court's prompt instruction to disregard cured the error, if any. *Williams v. State*, 604 S.W.2d 146 (Tex.Cr.App.1980); *Cozby v. State*, 506 S.W.2d 589 (Tex.Cr.App.1974). These answers were particularly harmless in view of the fact P_____ and C_____ subsequently testified that they saw appellant and one of his companions with guns in their hands at the Lamp Post Inn. Grounds of error one and two are overruled.

The third ground of error is:

The prosecutor committed reversible error when, for the third time, he discussed the same hearsay testimony indicated in Appellant's first two grounds of error. Such conduct is a violation of the prosecutor's duty not to convict, but to see that justice is done (Tex.Code Crim.Proc. art. 2.01) and denied Appellant's right to a fair trial by an impartial jury. Tex. Const. art. 1 Sec. 10; Tex.Code Crim. Proc. art. 1.05.

The factual basis for the ground of error is that as the prosecutor continued his examination of the manager of the Lamp Post, he warned her that they could not go into what she told the police officers because it was hearsay.

■ Subsequently, the following colloquies took place:

[Questions by Mr. Ryman]:

\*    \*    \*    \*    \*    \*

Q: And what did you tell the police officers?

A: I told them that—

MR. CAMPION: Your Honor, I'll object to that as being—the best evidence would be what the policemen themselves testified to.

THE COURT: I'll permit her to testify what she told the police officers so long as it's not based upon hearsay but what she related to them.

[Questions by Mr. Ryman]:

Q: You can only testify as to what you observed yourself not what somebody else told you. The law doesn't permit—like if somebody told you something and you told the police that, we can't go into that during Court; do you understand what I mean?

A: Vaguely, but I don't know what I'm supposed to say because I told him what the girl told me and he did not want to talk to the girl. So, I let it go at that and I told him to go over there and talk to the men.

\*    \*    \*    \*    \*    \*

Appellant made only one objection to the questions, answers, and explanations of which he now complains and that was based on the best evidence rule. His ground of error is not based upon the objection made, but upon comment on hearsay evidence. Appellant must preserve error for review and may not for the first time raise a complaint on appeal. The error raised in trial must be the same as the objection before the trial court. *Nelson v. State*, 607 S.W.2d 554 (Tex.Cr.App.1980); *Daniels v. State*, 600 S.W.2d 813 (Tex.Cr.App.1980). *See also Ex parte Scarbrough*, 604 S.W.2d 170 (Tex.Cr.App.1980).

■ Apparently recognizing that he had not preserved the alleged error of which he

now complains, appellant seeks to raise to a constitutional level the question of impropriety on the part of the prosecutor. Even errors based upon constitutional guaranties must be preserved by objection or they will be waived. *Ex parte Bagley,* 509 S.W.2d 332 (Tex.Cr.App.1974). Appellant's contention was not preserved below and is not properly before the court. Ground of error number three is overruled.

█ By his fourth, fifth, and sixth grounds of error, appellant claims that the trial court abused its discretion in overruling appellant's objections to testimony of San Antonio Police Officer Smith and of P_____'s father, concerning an extraneous offense. The factual basis underlying the objections concerned two telephone calls from P_____ to her father asking for money and telling him that she had a gun pointed at her head.

Officer Smith listened in to one of the telephone conversations and testified that he heard P_____ tell her father that a man had a gun at her head and that her father was to bring $5,000.00 or the man was going to kill her. Smith said he then heard a male voice at the other end tell her to hang up. Appellant made no objection at that time. The next question inquired as to whether Officer Smith had heard P_____'s father say anything to "them or her," to which Smith replied, "I didn't at that time." It was following the latter question and answer that appellant objected, not following the question and answer of which appellant now complains. Appellant did not properly preserve his objection to Smith's testimony concerning an extraneous offense, and therefore, no error is before us. *Beaupre v. State,* 526 S.W.2d 811 (Tex.Cr.App.), *cert. denied,* 423 U.S. 1037, 96 S.Ct. 573, 46 L.Ed.2d 412 (1975).

The fifth ground concerns the first of the two calls made by P_____ to her father. The objection was made to testimony by P_____'s father that his daughter called and said, "Dad, I've got to have $5,000.00." There was, however, no objection made when P_____'s father was asked what else P_____ said and he replied that she

repeated that she had to have $5,000.00 and that, "I've got a gun pointed at my head and they're going to kill me." Again, no error was preserved as to the latter testimony.

█ In his brief, appellant says that he objected to complainant's testimony about the telephone calls to her father and that his objection was overruled. Appellant in his brief concedes that there was no error in admitting the evidence at that time. Where an offense is one continuous transaction, or another offense is part of the case on trial or blended or closely interwoven, proof of all such facts is proper. *Archer v. State,* 607 S.W.2d 539 (Tex.Cr.App.1980). Appellant's real objection is that the testimony of Smith and P_____'s father was heard before complainant told the jury the same thing. By allowing portions of Smith's and the father's testimony to be introduced without objection and by conceding that the complainant's testimony to the same effect was appropriate, appellant has waived error. *Sanne v. State,* 609 S.W.2d 762 (Tex.Cr.App.1980). In addition, we find that he was not harmed by the testimony of Smith and the father in the context of the facts in this case. Grounds of error four, five and six are overruled.

█ The seventh ground of error is:
The trial court committed reversible error when it abused its discretion in allowing improper rebuttal over the objection of defense counsel. The evidence admitted went to further proof of injuries and subsequent medical problems of a person other than the complainant and against whom no crime was alleged to have been committed. This evidence was admissible for no purpose and was calculated to inflame the jury and prejudice the appellant's rights.

On direct examination, the State adduced testimony from C_____ about the sexual and physical abuse which she suffered, as well as her testimony regarding the rape of P_____ for which appellant was being tried. C_____ related to the jury the details of her beatings by appellant and his

companion, including an episode in which appellant rammed a shotgun barrel up her rectum. On cross-examination, appellant's counsel did not ask any questions relating to the injuries sustained by C_____. On re-direct examination, the following took place:

[Questions by Mr. Ryman]:

Q: All right. Now, in reference to the beating that you received, have you any scars on your face from that?

A: Yes.

Q: Would you point those out to the members of the jury, please.

A: Okay.

MR. CAMPION: Your Honor, I'd object to this as not being subject to rebuttal.

THE COURT: Overruled.

After the foregoing exchange, the witness described the scars and showed some of them to the jury. Then the prosecutor adduced for the second time testimony about the shotgun being inserted into her, and no objection was made. No error was preserved in the absence of objection. *Esquivel v. State,* 506 S.W.2d 613 (Tex.Cr.App. 1974). Finally we find, as did the court in *Cotner v. State,* 160 Tex.Cr.R. 211, 268 S.W.2d 142 (1954), that the trial court did not abuse its discretion in admitting on redirect examination C_____'s testimony which had been elicited on direct examination without objection. Ground of error number seven is overruled.

■ By his eighth and final ground of error, appellant charges:

The Trial Court committed reversible error when, prior to sentencing, it received evidence and denied Appellant and Appellant's counsel access to this evidence, which had been secretly presented to the Court by the prosecution, such evidence being a document compiled by the Texas Department of Public Safety. The document itself is rank hearsay and highly prejudicial to the Appellant. Such conduct denied the Appellant his right to confrontation under Article 1, Section 10 of the Constitution of the State of Texas and Vernon's Ann.C.C.P. Articles 1.05 and 1.25 and the Appellant's right to a public trial under Article 1, Section 10 of the Constitution of the State of Texas and Vernon's Ann.C.C.P. Article 1.05 and 1.24.

At a time after trial by jury of the guilt/innocence phase had begun and before sentencing by the court, Judge Roy Barrera, Jr., presiding, counsel for appellant went to Judge Barrera's chambers to examine the presentence report. While in chambers, counsel observed a booklet dealing with the Bandido Motorcycle Club on the judge's desk. One of the lawyers asked to see the booklet, but Judge Barrera would not permit counsel to review the document. These facts were testified to by Brock Huffman, one of the counsel for appellant, at the time of hearing on appellant's motion to reduce sentence and motion for new trial.

At that hearing, counsel for appellant called Dick Ryman, the assistant district attorney for Bexar County who prosecuted the case, as a witness. Ryman testified, in part, as follows:

\*   \*   \*   \*   \*   \*

Q: Did you present to the Court or for the Court's consideration evidence regarding the Bandido Motorcycle Organization?

A: I don't know if you could—would you repeat that question?

Q: Yes, sir; did you present to the Court evidence regarding the Bandido Motorcycle Organization as a part of your discussion or talks or whatever with His Honor, Judge Barrera?

A: I furnished the Court with a document that was compiled by the Department of Public Safety in—that referred to, in a general way, the Bandido Motorcycle Organization.

\*   \*   \*   \*   \*   \*

Q: Okay, sir. Did you furnish to the defendants a copy of that information that you furnished to Judge Barrera?

A: I was told by the people that I got it from that it was classified information, that it was information that is not due or is not supposed to be given to the general public. It contains a matter of

intelligence concerning the Bandido Motorcycle Organization that I don't know if it would be all that good for the Bandido Organization to know about it.

Q: Well, sir, I will ask you again, did you furnish a copy of that same material that you furnished this Honorable Court to the defense, the defendant or any of his attorneys at the time that it was furnished to the Court?

A: I was instructed that it was not to be furnished to the public in general. Those were the instructions. No, I didn't. I didn't, Mr. Campion.

        *    *    *    *    *    *

Q: Would you say it contains highly sensitive material?

A: Well, Mr. Campion, you define what you mean by sensitive and I will answer your question.

Q: You do admit that—who did you receive this information from?

A: An investigator in our office.

Q: Who is that?

A: I believe I received it from John Veltcamp.

Q: John Veltcamp? Okay. And do you know where Mr. Veltcamp received it?

A: He mentioned something about having to sign for it and I don't know whether he had to sign for it in Austin or in—where it was. I really don't know.

Q: Did you at the time that this instrument was tendered to his Honor, Judge Barrera, did you call to the Judge's attention that it was not to be shared with anybody else, that it was sensitive or classified information?

A: I believe I did. I'm not sure whether I did or not. I'm sure that Judge Barrera would know that but Mr. Campion, if you want to know the reason why that was given, I'll be glad to explain it to you in camera. I'm not going to do it in Open Court.

        *    *    *    *    *    *

Q: Is it a fair statement to say that was a general indictment of the Bandido Motorcycle Organization?

A: I think general information about who the Bandido organization is. I did not know prior to reading the document anything that was contained in it.

Q: All right. And—

A: With a few exceptions.

Q: All right. Is it a fair statement to say that the document would be very unflattering to the Bandido motorcycle members as a general group?

A: As best I can say, Mr. Campion, it is a frank computation of evidence pertaining to members of the Bandido Motorcycle Organization.

        *    *    *    *    *    *

Following that testimony on appellant's motion, a copy of the document, marked Defendant's Exhibit A, was admitted and ordered sealed by the court for consideration on appeal, it still not having been shown to appellant or his attorneys. We have inspected the 30-page document. It has no title, and there is no indication as to who prepared it. There is no indication in the document as to what agency or agencies prepared it, and there is no indication regarding where and from whom the "facts" related therein were obtained. Ryman's quoted testimony shows that he received the document from John Veltcamp, an investigator in the Bexar County District Attorney's Office. He did not know from whom Veltcamp received it but understood he got it from someone in Austin and had to sign for it. Ryman also said it was prepared by the Department of Public Safety.

The document, which appears to be a compilation of information about the Bandido Motorcycle Club, gives names and other information regarding some of the officers of the club. It purports to record names of members in prison, under indictment, those convicted of felonies, and some of those being sought by law enforcement officers. Appellant's name appears in Exhibit A. The document has both specific and general information, and it can be characterized as a document most unfavorable to the Bandi-

dos. The following paragraph will serve to give a flavor of the instrument:

> The history of the BANDIDO MOTOR-CYCLE CLUB is one of violence and escalating criminal activity. There is virtually no criminal offense for which a club member has not been arrested or convicted. The percentage of club members who are convicted felons is incredible. The percentage of club members who are presently in prison is awesome. The reputation of the club and club members spans the state and intimidates many citizens who would testify against club members charged with crimes. The frequent articles by the media that club members are misunderstood social deviates who are persecuted by the police can not be based on fact. Recent intelligence information indicates that club members have connections with organized crime figures. The club itself seems to be evolving into an organized crime group. Club members pose a threat to the safety of society and their actions merit the close attention of all law enforcement officers.

Appellant, however, was never able to inspect the document in order to object. Ryman obtained it and gave it to Judge Barrera after the commencement of the trial and before sentencing by the court.

The opinion in *Porter v. State,* 578 S.W.2d 742 (Tex.Cr.App.1979), *cert. denied,* —— U.S. ——, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982), provides helpful guidance. There the court recognized,

> The right to cross-examine witnesses is implicit within the right to confrontation provided by the Sixth Amendment to the Constitution of the United States as applied through the Fourteenth Amendment. *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1967); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct.

1074, 13 L.Ed.2d 934 (1965). The right to confront and cross-examine witnesses has also been held to be essential to due process and a fair trial within the provisions of the Fourteenth Amendment to the Constitution of the United States. E.g., *In Re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948) and *Chambers v. Mississippi, supra.*

*Id.* at 745. In *Porter,* the trial court admitted, over objection of hearsay and denial of confrontation, certain letters and other documents kept by a United States probation-parole officer, some of which referred to appellant's "aggressive nature," and his "psychopathic personality," his indications of "paranoid schizophrenic behavior," his drug addiction, and the opinion that his rehabilitative rating was very poor. The Court of Criminal Appeals described the instruments as follows:

> ... These letters contain hearsay upon hearsay, as well as opinions regarding appellant's mental and physical condition and his amenability to rehabilitation. The sources of these opinions are in most cases unnamed, and in no case are the authors or the unnamed sources shown to be competent to make the statements attributed to them. It defies reason to suggest that these letters, merely because they were collected in a file in a government office, have the indicia of reliability sufficient to insure the integrity of the fact finding process commensurate with the constitutional rights of confrontation and cross-examination. *See Estes v. State,* 162 Tex.Cr.R. 122, 283 S.W.2d 52 (1955); *Hartman v. Harder,* 322 S.W.2d 555 (Tex.Civ.App.—Amarillo 1959, no writ).

*Id.* at 746. Reversing the case, the court said,

> ... While the facts contained in the documents in question may have been relevant to punishment, the manner in which the State sought to prove those facts denied appellant his constitutional rights of confrontation and cross-examination.

*Id.* at 748. The same court reversed a conviction for driving while intoxicated in *Estes v. State,* 162 Tex.Cr.R. 122, 283 S.W.2d 52 (1955). In that case the trial court admitted over objections of hearsay, denial of confrontation, and deprivation of cross-examination, a letter on the stationery of the Texas Department of Public Safety and a certificate of a laboratory report concerning alcohol content in a blood sample. While names appeared on the instruments, neither instrument was signed nor proved under Tex.Rev.Civ.Stat.Ann. arts. 3731a and 3737e (Vernon Supp.1982).

Similarly, the court reversed the judgment in *Coulter v. State,* 494 S.W.2d 876 (Tex.Cr.App.1973) for error in admission of a document concerning a sale by the defendant of some marihuana to a United States Treasury agent. The court recognized that the right of cross-examination is implicit in the constitutional right of confrontation and also recognized that such rights were not absolute, saying that otherwise there could be no exceptions to the hearsay rule. The test applied in a criminal trial for receipt into evidence of a written record is whether that record "is of such trustworthiness as to guarantee the same protection provided by the constitutional rights of confrontation." *Id.* at 884.

We hold that Defendant's Exhibit A is not of such trustworthiness. It is, in the words of *Porter,* hearsay upon hearsay, and opinion evidence as well, the sources of the information and the sources of the opinions not being identified. Any use by the trial judge would deny appellant his constitutional rights of confrontation and cross-examination, which is "constitutional error of the first magnitude." *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The standard applicable to an alleged violation of the right to confrontation under the Sixth and Fourteenth Amendments of the Constitution of the United States is that the State must show error to be harmless beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). We find that the State failed to show the error harmless beyond a reasonable doubt.

■ Appellant also insists that his right to a public trial was infringed by the trial court's reception of evidence *ex parte.* Tex. Code Crim.Pro.Ann. art. 1.24 (Vernon 1977) provides simply and succinctly, "The proceedings and trials in all courts shall be public." The statute means just that, and may be enforced by a criminal defendant, the public, and the press. *Houston Chronicle Publishing Co. v. Shaver,* 630 S.W.2d 927 (Tex.Cr.App.1982). *See also Houston Chronicle Publishing Co. v. McMaster,* 598 S.W.2d 864 (Tex.Cr.App.1980). We hold that by receiving Defendant's Exhibit A, the trial judge denied appellant his right to a public trial to the extent that the judge made use of it.

Ryman's transparent motivation in obtaining the document and giving it to Judge Barrera *ex parte* was to seek a severe sentence based in part upon guilt by association. Amounting to persecution rather than prosecution, this represents an act of reprehensible prosecutorial misconduct. It violates the spirit of the legislative admonition contained in article 2.01 of the Code of Criminal Procedure that "It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done." It for the same reason violates State Bar of Texas, Rules and Code of Professional Responsibility EC7–13 (1973), in that it was Ryman's duty not to prosecute but to do justice and to give the accused the benefit of the doubt. It further violates State Bar of Texas, Rules and Code of Professional Responsibility DR7–110(B)(1) and (2) (1973) in that Ryman communicated with a judge before whom an adversary proceeding was pending as to the merits of the cause.

. The acceptance of the document by Judge Barrera *ex parte* is in direct violation of State Bar of Texas, Rules and Code of Judicial Conduct, Canon No. 3 A(4) (1982), and can only be described as judicial misconduct. Such conduct cannot be tolerated. The people, including criminal defendants, are entitled to expect judges and prosecutors to honor constitutional, statutory, and

ethical safeguards established for the benefit of all of us. We sustain appellant's eighth ground of error.

We are not unmindful of the statements made by the trial judge at the sentencing hearing, that he had based his sentencing decision upon "solely ... the testimony of the two ... complaining witnesses," and not upon whether the appellant "has a reputation from any source or that he's affiliated with any group." It is undisputed, however, that the anonymous document was given to the trial judge by the prosecutor. The record is silent as to whether or not the judge read the document, or any part of it; but it is undisputed that defense counsel observed it on the judge's desk, in chambers, being refused permission to examine it. Even accepting at face value the trial judge's statement at the sentencing hearing concerning the basis for his sentencing decision, we would emphasize that in the trial of any case, it is essential not only that justice be done, but also that justice appear to be done. Our criminal justice system is already burdened with too high a degree of public skepticism about its fairness. To avoid further erosions of confidence that our courts do, indeed, treat all litigants with equal fairness, judges and prosecutors alike must keep themselves, like Caesar's wife, above suspicion by scrupulously avoiding situations in which their fairness and integrity could appear to be compromised.

Having found no reversible error in the jury trial of the guilt/innocence phase, we affirm the judgment of conviction. For the reasons given, we cannot, however, allow the sentence to stand. Under *Bullard v. State*, 548 S.W.2d 13, 18 (Tex.Cr.App.1977), and cases therein cited, a cause in which the only reversible error occurs at the punishment hearing before the trial judge alone may be remanded for a new punishment hearing only, without the necessity of reversing the judgment. We therefore remand the cause to the trial court, the judge of which is disqualified from taking further action in the punishment phase. Upon receipt of the mandate in this cause, said judge shall notify the presiding judge of the criminal district courts of Bexar County, who shall appoint another district judge to assess punishment. The judge so appointed may assess punishment based upon the testimony adduced and other evidence received in the entire trial of this cause (except for Defendant's Exhibit A which shall remain sealed) and may hold any further proceedings which he may deem necessary.

The judgment of conviction is affirmed. The sentence is vacated and the cause remanded with instructions for further proceedings not inconsistent herewith.